# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2024

Lyle W. Cayce
Clerk

No. 21-20235

Sharnez Hager,

*Plaintiff—Appellant*,

*versus*

Brinker Texas, Incorporated, *incorrectly named* Chilli's Bar
& Grill,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-595

Before Dennis, Southwick, and Wilson, *Circuit Judges*.

James L. Dennis, *Circuit Judge*:[†]

This public accommodation racial discrimination case comes to us on appeal from the district court's grant of summary judgment for the defendant, Brinker Texas, Inc., dismissing the claims of the plaintiff, Sharnez Hager. Brinker is a corporation that operates approximately 112 Chili's restaurants in south Texas. This case involves one of those Chili's

---

[†] Judge Southwick and Judge Wilson join this opinion except as to Part III.A.2.

restaurants in Rosenberg, Texas. Because Sharnez has established genuine disputes of material fact, we REVERSE the district court's award of summary judgment to Brinker and REMAND for further proceedings not inconsistent with this opinion.

## I. Facts and Procedural History

On March 31, 2017, Sharnez, along with her two sisters, a sister's boyfriend, her niece, and her nephew, walked into a Chili's restaurant in Rosenberg, Texas, operated by Brinker, and asked for a table for a large group. Sharnez is Black, as are the five members of her family who were with her. The white hostess, Emily Lentini, told Sharnez there would be a forty-five-minute wait. Sharnez noticed a large unoccupied table behind the hostess and asked if it was available. The hostess told her that the table was unavailable because it had been reserved by another customer; so Sharnez and her group went to the restaurant's waiting area. Sharnez and Brinker present different accounts of what happened next.

According to Sharnez's evidence, which we must accept as true at this stage,[1] about twenty minutes later, her fiancé (now husband) Kevin Hager, a white man, arrived at the restaurant. Without identifying himself, Kevin walked up to the hostess and asked for a table for a large group. The hostess said she would immediately seat Kevin at the table she had previously told Sharnez was reserved. Upon learning of this, Sharnez approached the hostess and asked how Kevin was able to get the table. The hostess told Sharnez that Kevin was the person who had reserved it. Sharnez told the hostess that she knew that was not true; that Kevin was her fiancé, and she knew that he had

---

[1] To the extent Sharnez's evidence is disputed by Brinker's, we must take Sharnez's version of disputed facts at summary judgment. *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348–49 (5th Cir. 2008).

not made reservations. The hostess said "Oh my god" and apologized. After speaking with the manager, Kevin, Sharnez, and her five family members were eventually seated at the table. A server came and took drink orders from some of the group, but she did not return. Instead, the server, the hostess, and other staff huddled together refusing to serve the table and whispering and pointing at Sharnez. After waiting thirty minutes without receiving any further service, Kevin, Sharnez, and their party left.

According to Brinker's version of the incident asserted in support of its motion for summary judgment, some time after the hostess told Sharnez the table was unavailable, Quincy, a different employee, noticed that Sharnez and Kevin appeared agitated by the length of the wait and offered to clear the unoccupied table for Kevin and the party. This appeared to anger Sharnez, who, according to Brinker, perceived that Kevin was offered the table because he is white, while she was not because she is Black. Once Kevin, Sharnez, and their party were seated, a server came to take the table's drink orders. After taking their orders, though, the white waiter, Kayla, said she refused to further serve the table because of Sharnez's rude and insulting demeanor.[2] The restaurant manager instead went to take drinks to the table, but by that time Sharnez's party was already on their way out.

Sharnez, proceeding pro se, filed a lawsuit against Brinker in state court initially asserting a single public accommodation claim under 42 U.S.C. § 2000a (Title II). Brinker removed the suit to federal district court. Sharnez later retained counsel and amended her complaint to assert additional claims seeking damages under 42 U.S.C. §§ 1981 and 1982; and in her amended complaint Sharnez continued to assert her Title II claim seeking only

---

[2] According to the restaurant's assistant manager, Frank Sorto, server Kayla told him that she refused to serve the table because either she or Sharnez was "still being racially charged."

declarative relief. With the consent of the parties, the district court referred the case to a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c). After discovery, Brinker moved for summary judgment, submitting as evidence the declaration of Tristan Venable, a Brinker officer heading its internal personnel operations. Several days after the incident at issue, Venable went to the Rosenberg Chili's and interviewed the assistant manager and two other employees. Venable's declaration concluded that "race did not play a factor in seating [Sharnez's] party that evening." Rather, he asserted that the hostess, Emily, put Sharnez on a "false wait" because there was not enough staff to handle the large table due to the volume of customers at that time and on that evening. In her opposition to Brinker's motion for summary judgment, Sharnez argued, inter alia, summary judgment was foreclosed due to genuine disputes as to whether the hostess, Emily, withheld the table from Sharnez and her group because of their race, or because of a "false wait" due to staff shortage or overwhelming business at the time.

Faced with Brinker's motion for summary judgment, the magistrate judge issued a Memorandum and Recommendation (M&R) recommending issuance of summary judgment to Brinker on all of Sharnez's claims. Purporting to apply the *McDonnell Douglas*[3] burden-shifting framework, the M&R assumed without deciding that Sharnez had shown a prima facie violation of §§ 1981 and 1982 but advised that she "failed to meet her burden" of showing with "substantial evidence" that Brinker's explanation for the conduct of its employees was pretextual. The magistrate judge recommended that Sharnez "produced no evidence to negate [Brinker's] explanation that the restaurant was understaffed and busy," which led to Sharnez being placed on a false wait. The magistrate judge then

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

recommended dismissal of Sharnez's Title II claim because she said that Sharnez, during her deposition, sought relief not authorized by Title II. The magistrate judge acknowledged that Sharnez's complaint sought declaratory relief, which is permitted under Title II, but reasoned that because Sharnez testified at her deposition that she only wanted monetary damages, her claim should be dismissed for seeking a remedy not authorized by statute. In the alternative, the magistrate judge reasoned that Sharnez's Title II claim failed for the same reason her §§ 1981 and 1982 claims did under the *McDonnell Douglas* framework. The district court adopted the magistrate judge's M&R without assigning reasons, analysis, or any change, over Sharnez's objection, in a three-sentence-long order. This timely appeal followed.

## II. Standards of Review

We review a grant of summary judgment de novo. *Fahim*, 551 F.3d at 348. Summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether a genuine issue as to any material fact exists, [the court] must view the evidence in the light most favorable to the nonmoving party." *Fahim*, 551 F.3d at 348–49.

Further, we review a district court's determination of whether evidence submitted in connection with a motion for summary judgment is competent for abuse of discretion. *McIntosh v. Partridge*, 540 F.3d 315, 320 (5th Cir. 2008) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

## III. Discussion

Our review proceeds as follows. First, we find that the magistrate judge erred by classifying Sharnez's evidence as entirely indirect, which

necessitated the use of the *McDonnell Douglas* framework. Second, even overlooking the first error, we find that the magistrate judge erred in her application of the *McDonnell Douglas* framework because (a) Sharnez made out a prima facie case of racial discrimination; (b) the Venable declaration is not competent summary judgment evidence, so Brinker did not state a non-discriminatory reason for its conduct; and (c) Sharnez produced evidence of Brinker's pretext. Finally, we hold that it was error for the magistrate judge to alternatively urge dismissal of Sharnez's Title II claim on account of her deposition testimony.

## A.

The magistrate judge recommended entry of summary judgment in favor of Brinker on Sharnez's § 1981, § 1982, and Title II claims because Sharnez "failed to meet her burden" of proving with "substantial evidence" that Brinker's reason for denying her a table and other restaurant services was Brinker's mere pretext for its employees' racial discrimination. Doing so, the magistrate judge made several legal errors that Sharnez now challenges on appeal.

First among those errors is the magistrate judge's assumption that this is purely a circumstantial evidence case (as opposed to a direct evidence case), requiring the court to use the *McDonnell Douglas* framework. On appeal, Sharnez challenges that finding because of her evidence that the Chili's hostess, Emily, on April 21, 2017, admitted in front of witnesses that she had discriminated against Sharnez; according to Sharnez and her witnesses, Emily said to Sharnez: "I apologize for discriminating against you."[4]

---

[4] Two members of Brinker's management were present for the apology, both were deposed, and neither contested Sharnez's deposition testimony.

Brinker argues that Sharnez's evidence of the hostess's apology is indirect evidence of discrimination because the hostess did not mention race in saying "I apologize for discriminating against you." That argument implicitly asks us to ignore that the hostess's apology was within its immediate context an unambiguous admission to racial discrimination; and asks us to not view the evidence in the light most favorable to the non-movant. *See Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) (holding that a defendant's admission that he did not want to hire older workers "would allow a reasonable juror to conclude" that he had discriminated against the plaintiff because of his age); *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 990–93 (5th Cir. 2005) (finding that remarks like "I've been told not to hire too many blacks" were direct evidence of racial discrimination because they related directly to the challenged conduct); *Fahim*, 551 F.3d at 348–49 (stating in a Title II case that "we must view the evidence in the light most favorable to the nonmoving party"); *Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 54 (1st Cir. 2021) (looking to the context of a statement to determine whether it qualified as direct evidence of discrimination); *see also Lowe v. Walbro LLC*, 972 F.3d 827, 833–34 (6th Cir. 2020) (recognizing that when a remark is subject to varying interpretations, we should take the interpretation most favorable to the non-moving party at the summary judgment stage). Here, Sharnez's conversations with several upper-management Brinker employees, in which she complained of racial discrimination during her visit and threatened to sue Brinker, culminated in a meeting between Brinker's management, attorneys for Brinker, Sharnez, and members of the Hager family, which could be seen as an effort by Brinker to placate Sharnez with Emily's apology and admission of discrimination and discourage her from pursuing a lawsuit. It was during that meeting that the hostess, Emily, apologized for "discriminating against [Sharnez]." Given this context and viewing the evidence in the light most

favorable to Sharnez, the hostess's apology for "discrimination" relates directly to the alleged conduct—racial discrimination—and is direct evidence of the hostess's intention to discriminate against Sharnez because of her race. *Jones*, 427 F.3d at 992 ("Direct evidence is evidence which, if believed, proves the fact without inference or presumption.").

The magistrate judge should have classified the apology as direct evidence and analyzed whether Brinker had produced a preponderance of evidence supporting its non-discriminatory reason for Sharnez's treatment. *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 192 (5th Cir. 2001); *see also Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 417 (5th Cir. 2003) (applying defendant's burden in direct evidence case at summary judgment stage). Since the court did not, and instead analyzed the evidence under the *McDonnell Douglas* framework, the grant of summary judgment to Brinker was improper.

As explained below, even if the hostess's apology constitutes indirect evidence necessitating the use of the *McDonnell Douglas* framework, the summary judgment of the district court still must be reversed. That framework—and our review—proceeds in three steps. First, a plaintiff must establish a prima facie case of discrimination. Second, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for its conduct. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981). If it does, third, the burden shifts back to the plaintiff to show that this proffered reason is merely pretext for discrimination. *Id.* at 256.

**1.**

First, we consider whether Brinker is correct that Sharnez cannot make out a prima facie case of discrimination. The magistrate judge skipped this step of the *McDonnell Douglas* analysis; instead, the magistrate judge assumed Sharnez made out a prima facie case but recommended summary

judgment for Brinker on other grounds. On appeal, Brinker argues that Sharnez cannot even make out her prima facie case because she was eventually seated at a table in the Rosenberg Chili's. We disagree as a matter of law. Brinker's argument is meritless because, as we explain below, it is based on a legally erroneous and unjustifiably narrow interpretation of the statutes at issue in this case. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004).[5]

To make out a prima facie case of a violation of §§ 1981 or 1982, a plaintiff must establish at trial "(1) that [she] is a member of a racial minority; (2) that [the defendant] had intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute."[6] *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001). A prima facie case under Title II differs slightly, requiring a plaintiff to demonstrate at trial that "(1) she is a member of a protected

---

[5] The history of the Supreme Court's interpretation of § 1981's (and, by extension, § 1982's) scope bears emphasis. *See CBOCS West, Inc.*, 553 U.S. at 451 ("[T]his Court has long interpreted §§ 1981 and 1982 alike."). In *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), the Supreme Court narrowly held "that the statutory right to 'make and enforce contracts' did not protect against harassing conduct that occurred *after* the enforcement of the contract." *Jones*, 541 U.S. at 373 (emphasis added). "The Court added that the word 'enforce' does not apply to post-contract formation conduct unless the discrimination at issue 'infects the legal process in ways that prevent one from enforcing contract rights.'" *CBOCS West, Inc.*, 553 U.S. at 449 (quoting *Patterson*, 491 U.S. at 177). Congress disagreed with that crabbed view and, in 1991, "add[e]d a new subsection to § 1981 that defines the term 'make and enforce contracts' to include the 'termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* (quoting 42 U.S.C. § 1981(b)). Congress made clear that there is no distinction between pre- and post-contract formation conduct because the scopes of §§ 1981 and 1982 are broad enough to penalize discriminatory conduct aimed at contract formation, enforcement, or enjoyment.

class; (2) she attempted to contract for the services of a public accommodation; (3) she was denied those services; and (4) the services were made available to similarly situated persons outside her protected class." *Fahim*, 551 F.3d at 350. Brinker's meritless argument is that Sharnez failed to make a prima facie case on any of her claims because Sharnez was ultimately seated at a table, meaning she was never refused the right to make a contract that § 1981 protects, the right to purchase personal property that § 1982 protects, or the right to service by a public accommodation that Title II protects.

We must reject Brinker's arguments. Congress did not draft these watershed anti-discrimination laws so narrowly. Section 1981(b) protects the right to "make and enforce contracts," defining that term broadly to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b); *see also Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1016 (5th Cir. 2023) ("This circuit has . . . interpreted § 1981 in a broad sense."). Section 1982 protects a slightly different right—that of transacting in property—but courts, including ours, often construe §§ 1981 and 1982 claims in tandem.[7] *Williams v. Dillard's Dep't Stores, Inc.*, 211 F. App'x 327, 329 (5th Cir. 2006) (unpublished) (citing *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 440 (1973)) (quoting *Morris v. Off. Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996)). Our court has stated that, in the restaurant context, the contractual relationship contemplated by § 1981 is one that continues "over the course of the meal and entitles the customer to benefits in addition to the meal purchased." *Arguello v. Conoco, Inc.*, 330 F.3d 355, 360 (5th Cir. 2003). This is in contrast to the contractual relationship in a "retail merchandise

---

[7] To be sure, though the claims are analyzed "in tandem," Sharnez's § 1982 claim does not survive merely because the § 1981 claim does.

context," which is discrete and typically concludes upon the successful purchase of a good. *Id.* at 360–61. Thus, the contractual relationship between a restaurant and a customer includes more than simply the purchase of food (which, according to Sharnez's evidence, she was never given the opportunity to do). It encompasses related "benefits, such as utensils with which to eat the food, access to the restrooms, and the opportunity to consume the meal without exposure to harassment rising to the level that would force the patrons to leave the restaurant." *Dunaway v. Cowboys Nightlife, Inc.*, 436 F. App'x 386, 392 (5th Cir. 2011) (unpublished); *see also Arguello*, 330 F.3d at 360 n.9 (first citing *McCaleb v. Pizza Hut of Am., Inc.*, 28 F.Supp.2d 1043 (N.D. Ill. 1998) ("[Pizza Hut] failed to provide [the customers] the full benefits of the contract in that, among other things, they failed to provide [the customers] with the proper utensils and created a disturbing atmosphere in which to eat."); and then citing *Charity v. Denny's, Inc.*, No. 98-0554, 1999 WL 544687, at *3 (E.D. La. July 26, 1999) ("[I]t could reasonably be said that a customer who enters a restaurant is contracting for more than just food . . . . Dining in a restaurant includes being served in an atmosphere which a reasonable person would expect in the chosen place.")).

Title II of the 1964 Civil Rights Act is also far-reaching, containing a "sweeping prohibition of discrimination" in public accommodations. *Daniel v. Paul*, 395 U.S. 298, 301 (1969). The law guarantees "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation." 42 U.S.C. § 2000a(a); *Fahim*, 551 F.3d at 349; *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964). It is clear from the text of the statute itself that Title II concerns more than just the outright denial of services, as Brinker argues. It prohibits discrimination in the "privileges, advantages, and accommodations" offered as well. Moreover, Title II does not simply prohibit discrimination in the provision of service, it guarantees "equal

enjoyment" of that service. 42 U.S.C. § 2000a(a). A restaurant cannot preference seating white customers over Black customers and be said to offer "equal enjoyment" of its services to its Black patrons, simply because they were, before the end of the day, offered a table.

Sharnez's evidence shows that she and her Black family were told they must wait forty-five minutes to be seated and denied immediate seating at an unoccupied large table; that, about twenty minutes later, the same large table was provided for immediate seating to a white man; that once eventually seated she and her group waited for thirty minutes without service; that no wait staff took her party's food orders or delivered their drinks; and that the hostess and wait staff refused to service their table, remaining huddled and pointing at and whispering about Sharnez. Ultimately, Sharnez and her group were made to feel so uncomfortable that they left the restaurant without receiving genuine or equal restaurant service. These facts easily make out and support an inference of discriminatory treatment on the basis of race in the sort of relationship that we recognize exists between a public accommodation restaurant and its patrons. Brinker's argument that Sharnez cannot establish a prima facie case of violations of § 1981, § 1982, and Title II therefore fails. Sharnez satisfies the first step of the *McDonnell Douglas* framework.

**2.**

The second step of the *McDonnell Douglas* framework requires that we consider Brinker's alleged non-discriminatory reason for its conduct. Brinker submitted a declaration from Tristan Venable, a Brinker in-house human resources employee that it dispatched to Rosenberg to investigate Sharnez's potential claims several days after the incident. Venable concludes in his declaration that racial discrimination played no part in the incident, but that Sharnez and her group were put on a "false wait" because the restaurant was understaffed and unable to adequately service the large table she requested.

The magistrate judge recommended that Brinker met its summary judgment burden at this stage in the *McDonnell Douglas* framework of setting forth a non-discriminatory reason for its conduct on account of the Venable declaration. This was error for two reasons: (1) a declaration made without personal knowledge is generally not competent summary judgment evidence and (2) the business record exception does not apply to documents made in anticipation of litigation.

First, Venable's lack of personal knowledge is plain. As our court recently made clear in *D'Onofrio v. Vacation Publications, Inc.*, "'[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" 888 F.3d 197, 208 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(c)(4)). While "[a]t the summary judgment stage, evidence relied upon need not be presented in an admissible form, . . . it must be 'capable of being presented in a form that would be admissible in evidence.'" *Id.* (quoting *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (further internal quotations omitted)). "Neither legal conclusions nor statements made without personal knowledge are capable of being so presented." *Id.* (citing Fed. R. Evid. 602, 701, 702). "[T]he rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact is a most pervasive manifestation of the common law insistence upon the most reliable sources of information." Fed. R. Evid. 602 advisory committee's note on proposed rules (citations and quotations omitted). Applying *D'Onofrio* to this case, it is apparent that the objected-to statements of Venable were made without personal knowledge of supporting facts because Venable was not at the restaurant during the incident.

Second, the business record exception does not save the declaration from Venable's lack of personal knowledge. The magistrate judge agreed with Brinker's contrary contention and, in doing so, misread *Brauninger v. Motes* as supporting the admission in evidence of Venable's declaration. 260 F. App'x 634 (5th Cir. 2007) (unpublished).[8] It doesn't. It held that an employer's human resource managers' reports and letters tracing steps in investigating complaints of sexual harassment against an employee leading to discharge were admissible business records; but it also recognized that such reports would be "inadmissible where their 'primary utility is for litigation.'" *Id.* at 637 (quoting *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988)). "Construing the statutory predecessor to rule 803(6), the Supreme Court held that a railroad's accident reports were inadmissible where 'those reports are not for the systematic conduct of the enterprise as a railroad business' but rather 'are calculated for use essentially in the court.'" *Id.* (quoting *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943)). "Applying *Palmer*, this court has deemed reports inadmissible where their 'primary utility' is for litigation." *Id.* (quoting *Broad. Music, Inc.*, 855 F.2d at 238).

These precepts are evident in the text of Federal Rule of Evidence 803(6) itself. Business records are admissible in civil and criminal cases where they have been "kept in the course of a regularly conducted business activity," FED. R. EVID. 803(6)(b), and where it was the regular practice of that business activity to make the particular writing, statement, report or record part of its business records. FED. R. EVID. 803(6)(c). When these

---

[8] *Brauninger* is unpublished, and this court's unpublished opinions issued in or after 1996 "are not precedent" except in limited circumstances, 5TH CIR. R. 47.5.4, though they "may be persuasive authority," *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006). *Brauninger*'s holdings are merely a reflection of the Federal Rules of Evidence.

prerequisites are met, the business records exception has been held applicable to many kinds of writings made in the regular course of business, such as account books, bank records, and bills of lading. "On the other hand, the business records exception has been held inapplicable to writings not made, or shown to have been made, in [the] regular course of business, such as an accident report, a bill for labor and material, . . . a diary or personal record book, . . . a salesperson's letter as to a theft, . . . and a statement of expenses for repairs." 8 Cyclopedia of Fed. Proc. (3d Ed.) § 26:372 (citations omitted). "Summaries of records prepared for litigation are not admissible under the business records exception to the hearsay rule, because litigation is not a 'regularly conducted business activity'—indeed, "documents prepared specifically for use in litigation are 'dripping with motivations to misrepresent.'" *Id.* (quoting *Hoffman v. Palmer*, 129 F.2d 976 (2d Cir. 1942), *aff'd*, 318 U.S. 109 (1943)) (citations omitted).

Here, the Venable declaration and Exhibit B were prepared immediately after the threat of Sharnez's litigation loomed as Brinker knew that Sharnez complained of racial discrimination and mentioned contacting her lawyer. Venable's conclusory assertion that the declaration and Exhibit B were made in the regular course of Brinker's business, with no further explanation about whether it was company procedure to make similar records, does not frustrate this conclusion. *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) ("[C]onclusory assertions cannot be used in an affidavit on summary judgment."). Quite the opposite, Venable admitted that he had never before conducted an investigation into a guest complaint of racial discrimination, further undercutting any claim that the declaration was made in the "regular course" of business. It is thus unmistakable that the declaration and Exhibit B were prepared in anticipation of litigation. *See Palmer*, 318 U.S. at 114 (finding, prior to the codification of the Federal Rules of Evidence, that an accident report prepared by a railroad employee did not

qualify as a business record because it was "calculated for use essentially in the court, not in the business"). The business record exception under Rule 803(6) of the Federal Rules of Evidence does not apply.

In sum, Tristen Venable lacked personal knowledge and the business record exception does not apply. The Venable declaration is therefore not competent summary judgment evidence, and the magistrate judge abused her discretion by overruling Sharnez's objection to the admission of the Venable declaration. This is yet another basis to reverse the entry of summary judgment—Brinker did not satisfy the second step of the *McDonnell Douglas* framework. Nevertheless, as demonstrated below, even considering the Venable declaration in conjunction with Brinker's other, competent summary judgment evidence, Brinker has not shown an absence of disputed material facts, as required for summary judgment by Rule 56 of the Federal Rules of Civil Procedure.

**3.**

The third step of the *McDonnell Douglas* framework requires that we consider Sharnez's evidence showing Brinker's pretext. Because the magistrate judge found that Brinker carried its burden of stating a legitimate, non-discriminatory reason for not seating Sharnez's group at the table, the burden should have shifted back to Sharnez to create a genuine dispute of material fact with Brinker's posited non-discriminatory reason. However, the magistrate judge held Sharnez to an even higher standard, requiring her to present "substantial evidence" and "negate[] all of Defendant's non-discriminatory reasons for putting [Sharnez] on a [false] wait list." True, this court has said that at trial a plaintiff must provide "substantial evidence" to actually rebut evidence of a defendant's legitimate non-discriminatory reasons, but in the summary judgment context "substantial evidence" is evidence that is "enough to support a reasonable inference that the proffered

reason is false; a mere shadow of doubt is insufficient." *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001) (quoting *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999)). Put in terms closer to the summary judgment standard, the plaintiff must "offer sufficient evidence to create a genuine issue of material fact" vis-à-vis the defendant's proffered reason. *Fahim*, 551 F.3d at 349 (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007)). To the extent the magistrate judge applied a higher standard, which the district court adopted, this was error.

Under the proper standard, we conclude that there is enough evidence in the summary judgment record for a reasonable jury to find Brinker's stated reason for its conduct not worthy of credence. *See Kendall v. Block*, 821 F.2d 1142, 1146 (5th Cir. 1987) ("a plaintiff may prevail" by showing the defendant's "proffered explanation is not worthy of credence").[9] Put another way, viewing Sharnez's evidence in the light most favorable to her, a reasonable jury could find Brinker's stated reason (that the hostess put Sharnez and her family on a "false wait" only because Chili's was too busy to require the wait staff to immediately begin to service that additional large table) is not worthy of credence for at least two independent reasons.

First, we have long held that a defendant's shifting, inconsistent reasons for objectionable conduct can provide sufficient evidence of pretext. *Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002) (recognizing that a "disingenuous and inconsistent" explanation for discriminatory conduct casts doubt on the proffered reason, which is sufficient to defeat summary

---

[9] Though *Kendall* and other cases we rely on were decided in the context of Title VII claims, "there is but scant case law under Title II," as opposed to Title VII, which "has produced a good deal of case law. For this reason, courts faced with a Title II case [correctly] borrow Title VII authority." *Fahim*, 551 F.3d at 349–50.

judgment because "a factfinder may infer the ultimate fact of retaliation from the falsity of the explanation"); *see also Burrell*, 482 F.3d at 412 n.11 ("[A]n employer's inconsistent explanations for its employment decisions at different times permit[] a jury to infer that the employer's proffered reasons are pretextual."). Here, if Brinker's stated reason on summary judgment for its employees' conduct were true (i.e., a false wait), a reasonable jury might find that it makes the hostess's earlier reason given to Sharnez for withholding the table from her—that it had been reserved by another guest—not only dishonest but unnecessarily contrived; and that it would make the hostess's reason that Kevin got the table—that he was the person who had reserved it—blatantly entangled and implausible. Neither Sharnez nor Brinker claims Kevin had reserved a table, and there is substantial evidence that "[t]he Rosenberg Chili's d[id] not take advance reservations." Nor does anyone contend that the restaurant's business calmed down perceptively just before Kevin appeared. What's more, if the hostess believed Kevin to have been a guest separate from Sharnez's party then the fact that the restaurant was busy would not explain why Sharnez, who asked for a table for seven, was denied a large empty table, but a white man who arrived twenty minutes later and also asked for a table for seven was given the same one. These contradictions and fluid justifications tend to show that the reason given by Brinker on summary judgment is not worthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (recognizing that a "plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the [defendant]'s proffered explanation is unworthy of credence.'" (quoting *Burdine*, 450 U.S. at 256)).

Second, there is evidence that days after the incident the Chili's hostess, Emily, said to Sharnez in front of witnesses "I apologize for discriminating against you." Viewed in the light most favorable to Sharnez, the hostess was apologizing for racial discrimination that Sharnez

experienced during her visit to the Rosenberg Chili's. Sharnez's evidence of the apology alone sufficiently casts doubt on Brinker's "false wait" explanation for the denial of service, thereby enabling a reasonable factfinder to conclude that the explanation was false. "Resolution of this dispute is properly within the province of the trier of fact, and therefore summary judgment was inappropriate." *Gee*, 289 F.3d at 348.

The district court, in adopting the magistrate judge's recommendation, erred in dismissing Sharnez's § 1981, § 1982, and Title II claims by finding that she had not carried her summary judgment burden at the third step of *McDonnell Douglas*.

**B.**

Finally, the magistrate judge recommended that Sharnez had "limited her [Title II] claim to one for money damages" by testifying in a deposition that she wanted a monetary award. Title II authorizes only prospective injunctive and declaratory relief. 42 U.S.C. § 2000a-3; *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968). The magistrate judge recommended that Sharnez's Title II claim be dismissed on summary judgment "because she seeks relief to which she is not entitled under the statute." The district court adopted that recommendation in error.

The magistrate judge, the district court, and Brinker cite no authority for the notion that a plaintiff's prayer for relief in her complaint is automatically abandoned, waived, or in any way modified by her oral answer to a question at a deposition. This is likely because the notion runs counter to several fundamental aspects of federal civil procedure. First, demanding an improper remedy is not fatal to a plaintiff's claim so long as there are facts entitling her to some form of relief. *Doss v. S. Cent. Bell Tel. Co.*, 834 F.2d 421, 424 (5th Cir. 1987). Since injunctive and declaratory relief are available under Title II, Sharnez's claim (which included a request for declarative

relief) was entitled to survive regardless of what other remedy she alluded to in her deposition. Second, and more to the point here, a request for a particular form of relief, or a "demand for judgment," is a necessary component of a complaint. Fed. R. Civ. P. 8(a)(3); Wright & Miller, Federal Practice & Procedure § 1255–56 (4th ed.). A prayer for relief can only be modified through amendment of the complaint or voluntary dismissal. Given the procedural posture of this case, Sharnez would have needed leave of court, conference with her counsel, and amendment of pleadings or filing of another suit to accomplish either. Fed R. Civ. P. 15(a) (amendment as of right permitted within twenty-one days of filing, otherwise consent of opposing party or leave of court needed); Fed. R. Civ. P. 41(a) (permitting voluntary dismissal of actions without court order only before opposing party serves answer or summary judgment motion).

Obviously, Sharnez's testimony as a layperson at a deposition in response to a discursive question (i.e., what judgment or order would you like from the court?) was not a motion by Sharnez to the district court seeking leave to amend her complaint,[10] and there is nothing in the district court's docket record suggesting that Sharnez's complaint was then so amended.

The district court erred in adopting the magistrate judge's recommendation to dismiss Sharnez's Title II claim for seeking an improper

---

[10] A deposition elicits evidence and is not a pleading. *See Deposition*, Black's Law Dictionary (11th ed. 2019); Fed. R. Civ. P. 56(c) (a party may assert a fact via, inter alia, depositions); *cf.* Fed. R. Civ. P. 7(b)(1)(A)–(C) ("A request for a court order must be made by motion" and a motion must be "in writing unless made during a hearing or trial[,] . . . state with particularity the grounds for the order[,] . . . and state the relief sought.").

No. 21-20235

form of relief based on her deposition testimony that she wanted damages relief.

## IV. Conclusion

For the foregoing reasons, we REVERSE the district court's award of summary judgment to Brinker and REMAND for further proceedings not inconsistent with this opinion.

No. 21-20235

Cᴏʀʏ T. Wɪʟsᴏɴ, *Circuit Judge*, joined by Sᴏᴜᴛʜᴡɪᴄᴋ, *Circuit Judge*, concurring:

I join the court's principal opinion, except as to Part III.A.2., because I agree that the Chili's host's alleged statement to Sharnez Hager on April 21, 2017—"I apologize for discriminating against you"—creates a material issue of fact underlying Sharnez's claims, such that we should remand for further proceedings. Indeed, I would analyze this case as one involving direct evidence of discrimination and decline to employ the familiar *McDonnell Douglas* framework at all. *See ante*, Part III.A.; *see also Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004) ("If . . . [the] plaintiff produces direct evidence of discrimination, the *McDonnell Douglas* test is inapplicable."). Even so, I also concur in the majority opinion's alternative holding that the host's apology creates a material issue of fact as to whether Brinker's proffered explanation for the restaurant's actions on March 31, 2017, were pretextual. *See ante*, Part III.A.3. Where I part with the court's principal opinion is with its analysis and conclusion that the district court abused its discretion by considering Tristan Venable's declaration under the business record exception. *See ante*, Part III.A.2. Respectfully, the conclusion that the district court abused its discretion in admitting that evidence is both unnecessary to reach, and incorrect.

At the time Sharnez alleges that Brinker discriminated against her, Venable worked in Brinker's human resources department. Venable investigated the disputed incident on April 3, 2017—four days after it occurred. He interviewed the assistant manager who was on duty the night of the incident, as well as the two hosts. "As was . . . custom in conducting investigations [at Brinker]," Venable reported a summary of his findings to his supervisors the next day via an e-mail. Brinker included that e-mail thread as Exhibit B to Venable's declaration.

Because Venable's e-mail record was "made at or near the time" of the incident "from information transmitted by someone with knowledge" and such e-mails were regularly kept in the course of Brinker's human resource investigations, the business record exception to the rule against hearsay is plainly met here. *See* FED. R. EVID. 803(6). Nevertheless, JUDGE DENNIS concludes that the exception does not apply because the declaration and e-mails were prepared "in anticipation of litigation." *Ante*, at 12–16; *see Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988) (citing *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943)). But the district court could have reasonably found that "the [discrimination] investigation was triggered by [Sharnez's discrimination] complaint[] and not by [Sharnez's] subsequent threat to sue." *See Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007). Indeed, investigating discrimination complaints and documenting the findings of those investigations is an ordinary practice of human resource employees, even when a lawsuit is never threatened or filed. *See id.* at 638.

The principal opinion makes much of the fact that Venable's e-mails "were prepared immediately after the threat of Sharnez's litigation loomed as Brinker knew that Sharnez complained of racial discrimination and mentioned contacting her lawyer." *Ante*, at 15. But a plaintiff's threat of litigation cannot automatically disqualify legitimate records that a business would have created and collected regardless of the threat. Otherwise, would-be plaintiffs would be rewarded for early escalation of disputes by leaving businesses with hampered means to defend themselves should a lawsuit actually materialize.

The principal opinion also reasons that Venable's admission "that he had never before conducted an investigation into a guest complaint of racial discrimination[] further undercut[s] any claim that the declaration [and Exhibit B] w[ere] made in the 'regular course' of business." *Id.* But that

misreads Venable's noncommittal answer to a pointed question in his deposition. When asked if he "had . . . ever conducted an investigation into racial discrimination[] raised by a guest," he responded, "I don't . . . I don't know. I don't think so." Venable's answer to the very next question was that he "absolutely" had conducted investigations into racial discrimination claims raised by *employees*. Additionally, Exhibit A to Venable's affidavit substantiates that Brinker had a policy of investigating discrimination claims made by employees. That Venable could not remember investigating another incident raised by a guest might simply show that there had not been any previous incident. But his testimony does nothing to disprove that Brinker did not investigate discrimination claims in the regular course of business.

To the contrary, Venable's e-mail thread and his sworn statements about his investigation fall squarely within the confines of Rule 803(6). And given that Hager did not sue Brinker until nearly *two years* after the investigation occurred, the district court did not abuse its discretion by finding that Venable's contemporaneous e-mail communications were not prepared in anticipation of litigation. The district court thus properly allowed, and considered, Venable's declaration for summary judgment purposes. On remand, in the court's sound discretion, it may do so again.